Frances D. LESSER, George Lesser, Barbara Skinner, Janet Skinner, Bruce Minnix, Corinne Minnix, Fred Wilson, Alice Steer Wilson, Martin Pyle, and Hannah Pyle, Plaintiffs,

v.

The CITY OF CAPE MAY, in its capacity as designee of the United States Department of Housing and Urban Development, The Honorable William G. Gaffney, as Mayor of The City of Cape May, Cathy Buford Slater, as Chairperson of the Advisory Council on Historic Preservation, an independent agency of the United States of America, Advisory Council on Historic Preservation, an independent agency of the United States of America, Robert C. Shinn, Jr., in his official capacity as the New Jersey State Historic Preservation Officer, and Congress Hall Partners, LLC, Defendants.

Civil Action No. 99–5575 (JAP).

United States District Court,
D. New Jersey.

Aug. 16, 2000.

Jonathan M. Preziosi, Michael J. Canavan, Jamieson, Moore, Peskin & Spicer, P.C., Princeton, NJ (Stephen N. Dennis and Philip N. Walker, pro hac vice), for Plaintiffs.

Anthony P. Monzo, Michael I. Gross, Cooper Perskie April Niedelman Wagen-

heim & Levenson, Cape May Court House, NJ, for defendants City of Cape May and Mayor William G. Gaffney.

Robert J. Cleary, U.S. Attorney, Susan Handler–Menahem, Assistant U.S. Attorney, U.S. Attorney's Office, Newark, NJ, for defendants Cathy Buford Slater and Advisory Council on Historic Preservation.

John J. Farmer, Jr., Attorney General of New Jersey, Valerie Anne Gray, Deputy Attorney General, Trenton, NJ, for defendant Robert C. Shinn, Jr.

Jonathan I. Epstein, Christine Cartwright, Drinker Biddle & Shanley LLP, Princeton, NJ (Richard B. Nettler, pro hac vice), for defendant Congress Hall Partners, LLC.

## OPINION

PISANO, District Judge.

### INTRODUCTION

As the largest nineteenth century beachfront hotel remaining in the City of Cape May ("City" or "Cape May"), New Jersey, the Congress Hall Hotel ("Hotel") is a National Historic Landmark. Congress Hall Partners, LLC ("CHP"), the current owner of the Hotel, seeks to restore the Hotel and to construct a new conference center adjacent to the existing structure. Plaintiffs, a group of ten Cape May residents, challenge the proposed rehabilitation on the ground that certain statutory procedural requirements, which must precede any federally funded historic rehabilitation project, have not been satisfied. Plaintiffs allege violations of the National Historic Preservation Act of 1966 ("NHPA"), 16 U.S.C. § 470 et seq., and the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq., and seek judicial review of those alleged violations pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. On November 30, 1999, plaintiffs filed a seven-count complaint seeking declaratory and injunctive relief.[1] The Court has subject matter jurisdiction pursuant to 5 U.S.C. § 702, 28 U.S.C. § 1331, and 28 U.S.C. § 1361.

Pending before the Court are the following motions: (1) a motion to dismiss for failure to state a claim, or in the alternative, for summary judgment filed by defendant CHP; (2) a motion to dismiss for failure to state a claim, or in the alternative, for summary judgment filed by defendants Advisory Council on Historic Preservation ("Advisory Council") and Cathy Buford Slater;[2] (3) a motion to dismiss for failure to state a claim, or in the alternative, for summary judgment filed by defendants Cape May and Mayor William G. Gaffney ("Mayor Gaffney");[3] (4) a motion to dismiss for failure to state a claim, or in the alternative, for summary judgment filed by defendant Robert C. Shinn, Jr.;[4] (5) a cross-motion for summary judgment filed by plaintiffs; and (6) a motion for leave to file a second amended complaint filed by plaintiffs. All of the motions have been opposed. On April 7, 2000, the Court heard oral arguments.[5]

In the amended complaint, plaintiffs allege the following causes of action arising from the NHPA and the NEPA project review process: (1) that defendants arbitrarily and capriciously concluded that 202 parking spaces are permitted on the Hotel premises (Count One); (2) that defendants arbitrarily and capriciously decided to

---

1. On December 17, 1999, plaintiffs filed an amended complaint.

2. Cathy Buford Slater is sued in her official capacity as the Chairperson of the Advisory Council. (Amended Complaint ¶ 19).

3. Mayor Gaffney is sued in his official capacity as the Mayor of Cape May. (Amended Complaint ¶ 18).

4. Robert C. Shinn, Jr., is sued in his official capacity as the New Jersey State Historic Preservation Officer ("NJSHPO"). (Amended Complaint ¶ 20).

5. Plaintiffs' motion for leave to file a second amended complaint was filed in June 2000. The Court decides that motion without hearing oral arguments.

have the project governed by a Programmatic Agreement ("PA") rather than a Memorandum of Agreement ("MOA") (Count Two); (3) that the City arbitrarily and capriciously decided to bifurcate the project, thereby limiting the consideration of environmental effects to Phase I, the rehabilitation phase, and not reviewing Phase II, the new construction phase (Count Three); (4) that defendants failed to take into account the adverse effects of the project and failed to mitigate the potential harm of those effects (Count Four); (5) that the City failed to document adequately its determination that the project would have no adverse effects, and never considered feasible alternatives to the project (Count Five); and (6) that the City abrogated its duty to conduct an independent environmental review by relying on reports prepared by outside consultants (Count Six).[6]

Plaintiffs also seek leave to file a second amended complaint to assert an eighth claim which alleges that the improper decision to bifurcate the project resulted in an arbitrary and capricious determination that the rehabilitation phase qualified for a categorical exclusion from the requirement that an environmental impact statement ("EIS") be prepared.

In their motions, defendants argue that there are no substantive requirements of the NHPA and the NEPA, only procedural ones, and they have been satisfied. Defendants also contend that the discretionary decisions to use a PA, to bifurcate the project, and to rely on reports drafted by outside environmental consultants, are entitled to judicial deference because they were neither arbitrary nor capricious.

Having reviewed the numerous submissions from the parties, applicable case law, statutes and administrative regulations,[7] the Court agrees with defendants and finds no genuine issues of material fact and no merit to any claim asserted by plaintiffs. Accordingly, the Court grants defendants' motions for summary judgment,[8] and denies plaintiffs' cross-motion for summary judgment. The Court also denies plaintiffs' motion for leave to file a second amended complaint because there is no basis to sustain the proposed Count Eight. The Court's rejection of Count Three necessarily makes the proposed amendment futile.

Although the Court rejects plaintiffs' challenges, the Court recognizes the legitimate concerns that plaintiffs have voiced persistently throughout the administrative agency review process and during the course of this litigation. The Court is mindful of the competing interests at play here, which the NHPA and the NEPA seek to balance. *See* 16 U.S.C. § 470–1; 42 U.S.C. § 4332. Simply put, the economic interests of CHP, the project developer, are pitted against the historic and environmental preservation interests that plaintiffs have raised on behalf of themselves and the public. With respect to the public interests, the Court recognizes the unique features of Cape May, including its shoreline and rich history, which are important factors that warrant consideration. The Court is convinced that all interests were given due consideration during the NHPA and NEPA reviews, and that the outcome is adequately supported by the administrative record.

---

**6.** Although the amended complaint includes seven counts, the seventh count alleges that CHP is a necessary party pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 19, and, thus, does not state a cause of action.

**7.** New regulations became effective during the review process on June 17, 1999. 64 Fed.Reg. 27,044 (May 18, 1999). Throughout the opinion, the Court will note any differ-

ences between the new and former regulations.

**8.** The Court has analyzed defendants' alternative motions as motions for summary judgment, rather than motions to dismiss because materials outside the pleading were considered with respect to every count of the amended complaint except Count Seven. *See* Fed.R.Civ.P. 12(b).

### STATUTORY BACKGROUND

#### I. *The NHPA*

By enacting the NHPA, Congress empowered the federal government to play a more active, yet limited, role in preserving, restoring and maintaining the historic and cultural foundations of the nation. *See* 16 U.S.C. § 470; Exec. Order No. 11,593, 36 Fed.Reg. 8,921 (1971). This role is satisfied, in part, if the federal government "foster[s] conditions under which our modern society and our prehistoric and historic resources can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations...." 16 U.S.C. § 470–1(1). The NHPA created the Advisory Council, an independent federal agency, whose function, among others, is to "review the policies and programs of Federal agencies and recommend to such agencies methods to improve the effectiveness, coordination, and consistency of those policies and programs with the policies and programs carried out under [the NHPA]." 16 U.S.C. § 470j(a)(6).

The function of the Advisory Council in relation to a federal agency that is reviewing an undertaking [9] is as follows:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470v of this title a reasonable opportunity to comment with regard to such undertaking. [16 U.S.C. § 470f ("Section 106").]

When an undertaking may negatively affect a National Historic Landmark, the following additional requirement is mandated during the NHPA review process:

> Prior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking. [16 U.S.C. § 470h–2(f) ("Section 110(f)").]

The Advisory Council, as its name suggests, advises the reviewing federal agency on relevant historic considerations, but it does not dictate the outcome of the review process. *See Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 695–96 (3rd Cir.1999) (stating that the Advisory Council's comments during the NHPA review process are only advisory because Section 106 is merely a "stop, look, and listen" provision). Pursuant to 16 U.S.C. § 470s, the Advisory Council promulgates administrative regulations to govern the implementation of the review process. *See* 36 C.F.R. §§ 800.1–800.16 (1999).

The Agency Official is obligated to satisfy the section 106 requirement, and, if applicable, the section 110(f) requirement, and is granted the authority to approve an undertaking. 36 C.F.R. § 800.2(a) (1999); 36 C.F.R. § 800.1(a) (1998). "The Agency

---

9. The recently amended regulations define an undertaking as "any project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency...." 36 C.F.R. § 800.16(y) (1999). The prior regulations defined an undertaking as "any project, activity, or program that can result in changes in the character or use of historic properties, if any such historic properties are located in the area of potential effects." 36 C.F.R. § 800.2(o) (1998).

Official may be a State, local, or tribal government who has been delegated legal responsibility for compliance with section 106 in accordance with Federal law." 36 C.F.R. § 800.2(a) (1999); 36 C.F.R. § 800.2(b) (1998). When a project has the capacity to affect adversely a National Historic Landmark, the Agency Official must seek comments from the Advisory Council. 36 C.F.R. § 800.10(b) (1999); 36 C.F.R. § 800.6(a)(1)(i)(B) (1999); 36 C.F.R. § 800.10(a) (1998). Otherwise, requests for input from the Advisory Council are discretionary. 36 C.F.R. § 800.9(a) (1999); 36 C.F.R. § 800.5 (1998).

In addition to the Advisory Council, other parties may have "consultative roles" during the NHPA review process, including: (1) the State Historic Preservation Officer [10] who "advises and assists" the reviewing federal agency, 36 C.F.R. § 800.2(c)(1) (1999); (2) the National Park Service ("NPS") [11] if the undertaking may adversely affect a National Historic Landmark, 36 C.F.R. § 800.10(c) (1999); (3) a representative of the local government, 36 C.F.R. § 800.2(c)(4) (1999); (4) the applicant seeking federal assistance, 36 C.F.R. § 800.2(c)(5) (1999); (5) certain "consulting parties" who possess "a demonstrated interest in the undertaking," 36 C.F.R. § 800.2(c)(6) (1999); and (6) the public, whose views "are essential to informed decision-making in the section 106 process." 36 C.F.R. § 800.2(d) (1999). *See* 36 C.F.R. § 800.1(c) (1998).

During the review process, the threshold issues are whether the proposed project amounts to an undertaking and what are the potential effects, if any, of that undertaking. 36 C.F.R. § 800.3(a) (1999); 36 C.F.R. § 800.4(a) (1998). "An undertaking has an effect on a historic property when the undertaking may alter characteristics of the property that may qualify the property for inclusion in the National Regis-

ter." 36 C.F.R. § 800.9(a) (1998). *See* 36 C.F.R. § 800.16(i) (1999). "An undertaking is considered to have an adverse effect when the effect on a historic property may diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.9(b) (1998).

## II. *The NEPA*

Congress enacted the NEPA to promote a national policy of reducing environmental harm. *See* 42 U.S.C. § 4321. This goal is accomplished by requiring agencies to balance the environmental harms of projects against countervailing benefits, including economic ones. *Morris County Trust for Historic Preservation v. Pierce*, 714 F.2d 271, 276 (3rd Cir.1983); *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 188 (3rd Cir.1983). When balancing these competing interests, agencies are not required to elevate environmental concerns over other factors. *Ibid.* Rather, the NEPA only mandates that an agency consider the environmental consequences of a project. *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). Even if a project poses a threat to the environment, as long as the negative effects are considered by the agency, it can still approve the project. *Ibid.* Consideration of environmental effects is accomplished by preparing an EIS, a "detailed statement" of the effects of a proposed project for all "major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(2)(C).

Like the NHPA, particular substantive outcomes are not required under the NEPA; instead, the focus of the reviewing agency and the public is on the environmental effects of the proposed action. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851,

---

**10.** In New Jersey, the State Historic Preservation Officer is the Commissioner of the Department of Environmental Protection. N.J.A.C. 7:4–1.3.

**11.** The NPS is an agency of the United States Department of the Interior.

104 L.Ed.2d 377 (1989) (citations omitted). "NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (citations omitted). *See also Northwest Environmental Defense Center v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir.1997) (citation omitted) ("NEPA exists to ensure a process, not a result.").

## STATEMENT OF FACTS [12]

### I. General Information

The Hotel is situated within the Cape May National Historic Landmark District ("NHLD") [13] at 251 Beach Drive, and is bounded by Beach Avenue to the south, Perry Street to the east, Congress Place to the north, and Congress Street to the west. (George Lesser Certif. ¶ 7 and Ex. 1). Originally constructed in 1816, the Hotel was destroyed by a fire in 1878, and was rebuilt the following year. (Amended Complaint ¶ 23; Montano Certif. ¶ 3). The Hotel is comprised of two buildings, a four-story L-shaped hotel, and a three-story annex that is connected to the hotel via a one-story porch.

### II. The Current Condition of the Hotel

In October 1995, CHP purchased the Hotel. (Amended Complaint ¶ 27). In the spring of 1996, CHP began making some minor structural repairs to the premises, which included removing the paved drive from the front lawn, painting the exterior of the building, and repairing the roof. (Montano Certif. ¶ 17). Over the years the Hotel has suffered some fire, water and structural damage, and the annex has suf-

fered significant structural damage making the west and south walls unstable. Both the Hotel and the annex require the installation of a new roof, mechanical systems, plumbing, and a heating and air conditioning system. Because of the Hotel's condition, it has remained mostly vacant since 1995, although some retail shops located on the first floor of the hotel were occupied for a short time. (Plaintiffs' Response to NJSHPO's Statement of Facts ¶ 5). In 1996, CHP began to formulate plans to rehabilitate the Hotel and to construct a new building on the premises to serve as a conference center. (CHP's Statement of Material Facts ¶ 5).

### III. The Agency Review Process Begins

On July 9, 1998, the City published a notice in the *Stars and Wave*, a local newspaper, informing the public that the City would host a hearing on July 14, 1998 regarding the proposal to submit to the United States Department of Housing and Urban Development ("HUD") a grant and loan application seeking partial federal funding for the project. (Montano Certif. ¶ 24 and Ex. 3). On July 21, 1998, after holding the public hearing at which plaintiffs George Lesser and Barbara Skinner objected to the proposed project, the Cape May Council adopted Resolution No. 202–7–98, which approved the filing of the requisite HUD applications to obtain the following federal funding for the project: (1) a HUD section 108 loan; (2) a HUD Economic Development Initiatives ("EDI") grant; and (3) a HUD Small Cities Economic Development grant.[14] (Montano Certif. ¶ 25 and Ex. 4).

On July 27, 1998, Mayor Gaffney's predecessor, Robert W. Elwell, Sr. ("Mayor Elwell"),[15] submitted an initial HUD appli-

---

**12.** All facts are undisputed unless otherwise stated.

**13.** On May 11, 1976, the City was designated an NHLD. (Amended Complaint ¶ 22; George Lesser Certif. ¶ 2).

**14.** On October 5, 1999, the Cape May Council adopted Resolution No. 252–10–99, which amended Resolution No. 202–7–98 to increase the amount of project funding. (Montano Certif. ¶ 69 and Ex. 44).

**15.** On July 1, 1999, Mayor Gaffney replaced Mayor Elwell. (Mayor Gaffney Certif. ¶ 1).

cation requesting federal funding for the project.[16] (Montano Certif. ¶ 27 and Ex. 6). Several weeks later, on August 10, 1998, CHP submitted a two-part application to the NPS and the NJSHPO seeking a historic preservation certification in order to qualify for a historic rehabilitation tax credit. (Montano Certif. ¶ 30 and Ex. 8).

In early September 1998, the Friends of Congress Hall, an organization comprised of Cape May property owners, submitted to the City and the NJSHPO written opposition to CHP's proposed project. (Montano Certif. ¶ 31 and Ex. 9). They argued that the project will "violate published federal historic preservation standards and guidelines on at least eleven major issues and various minor issues." (Montano Certif. Ex. 9).

By letter dated September 14, 1998, Mayor Elwell requested that the NJSHPO begin an immediate NHPA review of the undertaking. (Montano Certif. ¶ 32 and Ex. 10). On October 9, 1998, Mayor Elwell wrote a follow-up letter requesting that the NJSHPO determine whether the proposed project will have adverse effects so that the City could review those findings and subsequently issue its own determination. (Montano Certif. ¶ 33 and Ex. 11). By letter dated October 19, 1998, the Advisory Council informed Mayor Elwell that he would also have to consult with the Advisory Council to resolve any adverse effects on the NHLD. (Montano Certif. ¶ 34 and Ex. 12). On October 22, 1998, the City published a notice soliciting written public comments on the project and its compliance with applicable federal laws. (Montano Certif. ¶ 35 and Ex. 13). Dozens of public comments were submitted in fa-

vor and against the project. (Montano Certif. Exs. 15 and 24).

By letter dated January 12, 1999, the Advisory Council recommended that the City "coordinate the Section 106 review with the Historic Tax Credit review in an effort to avoid delays and duplication of effort." (Montano Certif. ¶ 39 and Ex. 17; George Lesser Certif. ¶ 8). In response to the Advisory Council's letter, the City stated that it was waiting to review the NJSHPO's findings before making its own determination. (Montano Certif. ¶ 40 and Ex. 18). The City's letter also noted that it had received many responses to its request for public comments and that "[a]ll of this input will be taken into consideration as well before making our effect determination." (Montano Certif. ¶ 40 and Ex. 18).

## IV. *The Project Plans Are Amended*

On February 3, 1999, CHP submitted a letter to the NJSHPO seeking to revise the initially proposed project "into a Phased project" under which Phase I would be the rehabilitation of the Hotel, and Phase II would be the construction of the new conference center. (Montano Certif. ¶ 41 and Ex. 19; George Lesser Certif. ¶ 10). On March 29, 1999, CHP submitted an amended historic preservation certification application which sought approval for the phased project to be completed over a sixty-month period. (Montano Certif. ¶ 42 and Ex. 20). According to the amended application, the proposed phasing would be as follows:

Phase I Scheme A: Completion of interior work in existing structures and repair and/or replacement in kind on the exteriors.

Because HUD designated the City as the "lead federal agency" responsible for complying with the NHPA review process, (Amended Complaint ¶ 17), under 36 C.F.R. § 800.2(a) (1999), the Mayor was the Agency Official responsible for insuring compliance with the NHPA. (Amended Complaint ¶ 18).

16. An amended funding application was filed on June 24, 1999. (Montano Certif. ¶ 28 and Ex. 7). By Resolution dated July 13, 1999, the New Jersey Economic Development Authority approved CHP's application for a HUD section 108 loan. (Montano Certif. ¶ 58 and Ex. 34).

Phase I Scheme B: Completion of interior work in existing structures and exterior improvements to existing structures.

Phase II: Completion of remainder of project as shown in application including new addition and exterior improvements.

[Montano Certif. Ex. 20.]

By letter dated May 5, 1999, the NJSHPO issued recommendations to CHP in response to the amended application. (Montano Certif. ¶ 43 and Ex. 21; George Lesser Certif. ¶ 14). By letter dated May 10, 1999, CHP requested that the City issue a finding that the proposed project would have "no adverse effect." (Montano Certif. ¶ 44 and Ex. 22).

## V. *The City Issues Its Effect Determination and the Other Agencies Comment*

On May 24, 1999, Mayor Elwell determined that the proposed project would have "no adverse effect" on the Hotel and the NHLD. (Montano Certif. ¶ 46 and Ex. 24). Three days later, the City published a notice advising the public that Mayor Elwell had reached a no-adverse effect conclusion, but that "notwithstanding the finding of 'no adverse effect,' the City is considering the preparation of a document that will mitigate any adverse impacts, if any, from any future renovations, additions or alterations to the Congress Hall Hotel." (Montano Certif. ¶ 47 and Ex. 25). The notice also stated that "the City invites comments from interested parties on the determination made by the City." (Montano Certif. Ex. 25). The City subsequently granted applications for consulting party status to George Lesser and Margaret, Janet, and Barbara Skinner. (Montano Certif. ¶ 48 and Ex. 26; George Lesser Certif. ¶ 15).

The Friends of Congress Hall and George Lesser submitted comments dated June 15, 1999 in opposition to the City's no-adverse effect determination, claiming that the Mayor's finding "is laughable as a substantively and procedurally defective document." (Montano Certif. Ex. 35). On June 16, 1999, the NJSHPO noted that it would concur with the Mayor's no-adverse effect assessment as long as nine minor conditions were met, but the NJSHPO found that "the project, taken as a whole (including Phase II), is not yet fully in conformance with the Secretary of the Interior's Standards for Rehabilitation and therefore will have **adverse effects** on Congress Hall. Accordingly, I agree that we need to develop a Programmatic Memorandum of Agreement for the project." (Montano Certif. ¶ 51 and Ex. 29; George Lesser Certif. ¶ 19) (emphasis in original).

On June 18, 1999, the City held a hearing which was attended by Mayor Elwell, representatives of CHP, the NJSHPO, and the Advisory Council, and the interested parties seeking designation as consulting parties.[17] (Montano Certif. ¶ 52). At the meeting, the Advisory Council stated that it intended to conclude that the undertaking could have adverse effects and those potential effects should be mitigated with a PA. (*Ibid.*). On June 28, 1999, the Advisory Council issued written comments which stated, in relevant part,

that the proposed undertaking when considered in its entirety, will have an adverse effect on the Cape May Historic District National Landmark (NHL) ... Notwithstanding the developer's assurance that the rehabilitation will meet the *Standards*, and his acceptance of the conditions set forth in the New Jersey SHPO's comment letter of June 16, 1999, to the City, we believe additional mitigation measures are warranted for Phase I, and ongoing consultation to resolve adverse effects which may occur during Phase I and subsequent phases is needed.

---

17. According to the City, the documentation in support of the Mayor's initial no-adverse effect finding was furnished to all interested parties at this meeting. (City's Brief p. 4).

To facilitate future consultation meetings, we have prepared a detailed outline which we recommend that the City use to draft a Programmatic Agreement (PA) (see Attachment B). Provisions included in the PA should 1) address known and potential adverse effects to Congress Hall which may result from the proposed rehabilitation and new addition; 2) provide for an analysis of alternatives to meet the parking requirements for the project; 3) consider the long-term indirect effects of the entire undertaking on the NHL; and 4) commit the City to exploring strategies to address the systemic parking problems within the NHL. In addition, the Agreement should provide for continued public input during the coordination of post-agreement reviews. Once the draft PA is prepared, it should be distributed to all consulting parties for their review and comment. The City should then convene another meeting in two to three weeks for all parties to discuss the draft PA and modifications to clarify and, if appropriate, expand the mitigation plan. [Montano Certif. Ex. 30.]

## VI. *The Drafting and Re–Drafting of the PA*

On June 29, 1999, CHP submitted to the City a draft PA which attempted to take into account most of the issues raised during the June 18, 1999 hearing. (Montano Certif. ¶ 54 and Ex. 31). On June 30, 1999, Mayor Elwell responded to the Advisory Council's June 28, 1999 letter by forwarding a draft PA for consideration. (Montano Certif. ¶ 55 and Ex. 32). On July 12, 1999, counsel for the Skinners submitted to the Advisory Council written comments, which claimed that "the project will cause significant and substantial adverse effects on [t]he Congress Hall Hotel and its site, on the Skinners' own historically significant property and on the Cape May National Historic Landmark District." (Montano Certif. Ex. 33). In late July 1999, the City circulated a draft PA to all consulting parties and agencies. (Montano Certif. ¶ 60 and Ex. 36).

In early August 1999, CHP submitted a second amended Part II Historic Application. (Montano Certif. ¶ 61; Montano Certif. Ex. 37). By letter dated August 12, 1999, the NPS acknowledged receipt of the second amended application and requested the submission of additional materials to complete it. (Montano Certif. ¶ 62 and Ex. 38).

On August 13, 1999, the consulting parties, including the Lessers and Skinners, attended a second meeting to discuss the draft PA. (Montano Certif. ¶ 63; Mayor Gaffney Certif. ¶¶ 7–8). At the meeting, the consulting parties argued that an MOA should be utilized, rather than a PA. (Montano Certif. ¶ 63). The Advisory Council rejected their request, citing the complexity of the project and the uncertainty of the addition as reasons not to use an MOA. (Montano Certif. ¶ 63). With respect to the permissibility of lawn parking, the Advisory Council claimed that it was a local zoning matter since the project did not propose any changes to the lawn itself. (Montano Certif. ¶ 63).

By separate letters dated August 27, 1999, the Friends of Congress Hall and the Skinners submitted their respective comments on the draft PA. (Montano Certif. ¶¶ 64–65 and Exs. 39–40). On September 22, 1999, the Skinners submitted additional comments. (Montano Certif. ¶ 67 and Ex. 42).

On September 3, 1999, the Cape May Solicitor requested written confirmation from the Advisory Council that the City had complied with the documentation requirements of the NHPA review process. (Montano Certif. ¶ 66 and Ex. 41). On October 18, 1999, the Advisory Council confirmed that the City had met those requirements. (Affidavit of Mayor Gaffney, Ex. I).

In early October 1999, the Mayor circulated the Advisory Council's revised draft

of the PA which addressed the concerns raised by the consulting parties, including the need for Phase I activities to be reviewed before completion of the design of Phase II because of financing deadlines; the need for compatibility with the architectural character of the Cape May National Historic Landmark District, as a whole, not just contributing buildings adjacent to the project site; the need to provide for ongoing involvement of the consulting parties during the revision of plans for rehabilitation and design development of the addition; the importance of the current lawn configuration, and the need to expand and restore this feature if the City can identify alternate offsite parking to respond to the local zoning requirements for commercial buildings; potential impacts of noise, lighting, and pollution; the need for an analysis of alternatives for the design of Phase II; the amount of parking to be allowed at Congress Hall should Phase II be completed; the roles and responsibilities of signatories to the PA; and, the need for future public briefings by the City regarding the status of the project.

[Montano Certif. Ex. 45.]

On October 18, 1999, the final PA was forwarded to the Mayor and the document was subsequently executed. (Montano Certif. ¶ 72 and Exs. 47–48).

During the fall of 1999, the Washington and Philadelphia branch offices of the NPS issued conflicting effect determinations with respect to the project. However, on November 15, 1999, the Washington NPS branch office issued a letter superseding all prior determinations by the branch offices and concluded that the project would not have any adverse effects if certain conditions were met.[18] (Montano Certif. Ex. 50). Further, the NPS conditionally approved the amended part two of the historic tax credit application. (Montano Certif. ¶ 75 and Ex. 50). One condition was that "[t]here will be no expansion of parking on the site beyond what is currently permitted by the mercantile license issued by the City of Cape May...." (Montano Certif. Ex. 50). The NJSHPO subsequently confirmed that it agreed with the conditional approval granted by the NPS. (Montano Certif. ¶ 76 and Ex. 51).

On November 30, 1999, plaintiffs initiated this action by filing a complaint. On December 7, 1999, the City of Cape May Historic Preservation Commission approved the Phase I plans. (Montano Certif. ¶ 77). On December 17, 1999, plaintiffs filed an amended complaint.

## STANDARD OF REVIEW

### I. *The APA*

5 U.S.C. § 702 provides in pertinent part: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." When reviewing an agency decision, the court must "determine whether the agency complied with the procedures mandated by the relevant statutes." *Vermont Yankee Nuclear Power Corp., supra,* 435 U.S. at 549 n. 21, 98 S.Ct. 1197 (citation omitted). *See* 5 U.S.C. § 706(2)(D). The standard of review for a discretionary agency decision is whether it was "arbitrary, capricious, an abuse of discretion, or not in accordance with law." 5 U.S.C. § 706(2)(A). *See Lindsey Coal Mining Co. v. Chater,* 90 F.3d 688, 691 (3rd Cir.1996).

### II. *Motion to Dismiss*

Fed.R.Civ.P. 12(b)(6) provides that a court may dismiss a complaint "for failure

---

**18.** According to plaintiffs, the Washington NPS branch office's letter was a direct result of political pressure which CHP had exerted with the assistance of New Jersey Congressman LoBiondo. (George Lesser Second Supplemental Certif. ¶ 7). While the record does not indicate clearly what transpired at the meeting between some defendants and LoBiondo, the Court rejects plaintiff's contention that the uncertainty of this event creates a genuine issue of material fact.

to state a claim upon which relief can be granted." In considering a Fed.R.Civ.P. 12(b)(6) motion, the court will accept the allegations of the complaint as true. *Nami v. Fauver*, 82 F.3d 63, 65 (3rd Cir. 1996). Dismissal of claims under Fed. R.Civ.P. 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Although the court must assume as true all facts alleged, "[i]t is not ... proper to assume that the [plaintiff] can prove any facts that it has not alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Finally, when "[c]onfronted with [a Fed.R.Civ.P. 12(b)(6) ] motion, the court must review the allegations of fact contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Commonwealth of Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 179 (3rd Cir.1988).

### III. *Summary Judgment*

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion, but must affirmatively come forward with admissible evidence establishing a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Ameri-*

can *Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3rd Cir.1986). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505. Where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3rd Cir.1987) (Becker, J., concurring).

### *DISCUSSION*

**I. *Count One—The City Did Not Act in an Arbitrary or Capricious Manner When It Found That 202 Parking Spaces Currently Exist on the Hotel Premises***

 In Count One of the amended complaint, plaintiffs allege that the PA contains an arbitrary and capricious legal determination that 202 parking spaces are permitted on the Hotel premises, and that is an implicit conclusion that the use of the lawn for parking 202 vehicles is a preexisting non-conforming use pursuant to N.J.S.A. 40:55D–68.[19] (Amended Com-

---

19. N.J.S.A. 40:55D–68 provides in relevant part: "Any nonconforming use or structure

existing at the time of the passage of an ordinance may be continued upon the lot or

plaint ¶¶ 67–75). According to plaintiffs, had defendants properly considered the lawn parking issue, the result would have been a determination that 202 parking spaces are not permitted on the premises. (Amended Complaint ¶¶ 69–73). Defendants contend that they are entitled to summary judgment on Count One because there was never a legal determination or assumption made respecting the legality of lawn parking; instead, the PA merely provides that 202 parking spaces currently exist on the premises. The Court finds that the PA does not conclude that 202 parking spaces are permitted on the premises, and further that it was not the role of any defendant to determine during the NHPA review process whether lawn parking is a pre-existing non-conforming use ·of the premises. Accordingly, defendants are entitled to summary judgment on Count One.

Plaintiffs have submitted certifications from several long-time Cape May residents, all of whom assert that lawn parking was rare until the early to mid–1980s, and that there was not daily, widespread parking on the lawn until the mid–1990s. (Barbara Skinner Certif. ¶¶ 24–25, 28–29, 35–36; Bruce Minnix Certif. ¶¶ 5,7; Mary Carolyn Pitts Certif. ¶¶ 1,3). Plaintiffs have also submitted two color infrared aerial photographs taken in March 1991 and March 1995 which purportedly show an absence of parked cars on the lawn. (George Lesser Second Supplemental Certif. ¶ 13 and Exs. 1–2). Plaintiffs submitted this evidence in support of their argument that the current intensity of parking on the premises did not predate the local zoning ordinance which was enacted in 1974, and, thus, lawn parking is not a pre-existing non-conforming use of the premises. (Affidavit of Mayor Gaffney Ex. H, p. 3).

In contrast to plaintiffs' claim that lawn parking is a relatively recent phenomenon, defendants assert that lawn parking has occurred for more than thirty years, and constitutes a preexisting non-conforming use of the premises. (CHP's Brief p. 2). Defendants also argue that the PA only makes a factual finding that 202 parking spaces currently exist on the Hotel premises, and it does not state that the use of 202 parking spaces is legal. Defendants point to the relevant provision of the PA which provides: "**WHEREAS**, the New Jersey SHPO and [Advisory] Council have determined that since 202 parking spaces are currently used on the Congress Hall site, the implementation of the Project will not, in and of itself, exacerbate existing parking and traffic management problems within the Cape May NHL District which fall under the jurisdiction of the City. . . ." (Montano Certif. Ex. 48, p. 3) (emphasis in original).

The PA does not suggest that there has been any legal determination that the use of 202 parking spaces on the Hotel property is permitted as a pre-existing non-conforming use. Rather, the Court views the above PA provision as a factual finding which is adequately supported by the record. Since 1996, the City has issued annually to CHP a mercantile license which indicates that 202 parking "units" exist on the Hotel premises. (Montano Certif. Ex. 46). In 1995, the mercantile license noted that 200 "units" existed, and prior to 1995 the number of parking "units" was not stated on the license. (*Ibid.*). According to Daniel Saunders, a Principal Historic Preservation Specialist for the NJSHPO, when he surveyed the premises on several occasions during the review process he observed that the lawn "was almost completely covered with parking." (Affidavit of Daniel Saunders ¶¶ 1, 16). Saunders also states that he "did not make

---

in the structure so occupied and any such structure may be restored or repaired in the event of partial destruction thereof." A non-conforming use is defined as "a use or activity which was lawful prior to the adoption, revi-

sion or amendment of a zoning ordinance, but which fails to conform to the requirements of the zoning district in which it is located by reasons of such adoption, revision or amendment." N.J.S.A. 40:55D–5.

a 'legal' determination of how many parking spaces should exist." (Affidavit of Daniel Saunders ¶ 17). Based on this evidence, the Court finds that the contested provision of the PA which states that 202 parking spaces currently exist has a factual basis and is neither an arbitrary nor capricious finding.

The Court also rejects plaintiffs' related argument that the City had an obligation to determine whether the parking of 202 vehicles on the lawn is a pre-existing nonconforming use. Plaintiffs allege that "[n]o legal authority exists under New Jersey Municipal Land Use Law or the local ordinances of the City of Cape May to permit CHP to operate a parking lot consisting of 202 parking spaces on the Lawn." (Amended Complaint ¶ 69). That may be true,[20] but such an argument is misplaced because no defendant had the authority to consider during the NHPA review process whether lawn parking was a pre-existing non-conforming use of the premises.[21]

The City points out that "[i]t is within the power and authority of the Planning Board, not the City's governing body or mayor, to either approve, disapprove, or request a modification of the site plan, which will be addressed as part of the administrative review process referenced in the Programmatic Agreement." (City's Brief p. 8). The Court agrees. The Mayor, as the Agency Official, was precluded from making a determination whether lawn parking is a pre-existing nonconforming use because that decision is consigned to the local zoning board pursuant to the New Jersey Municipal Land Use Law. *See* N.J.S.A. 40:55D–68 (providing that the board of adjustment determines whether a particular use is non-conforming); *see also*

*Cronin v. Township Committee,* 239 N.J.Super. 611, 617–18, 571 A.2d 1354 (App.Div.1990) (finding that the power of the board of adjustment to determine the existence of a non-conforming use cannot be delegated to another municipal body); *Lehrhaupt v. Flynn,* 140 N.J.Super. 250, 268, 356 A.2d 35 (App.Div.1976) (stating that planning board and board of adjustment are "entities independent of the governing body of the municipality"), *aff'd,* 75 N.J. 459, 383 A.2d 428 (1978).

The City, which assumed the role of HUD, a federal agency, during the review process, had a strictly limited set of procedural obligations to carry out pursuant to the NHPA and the NEPA. These duties did not include determining whether lawn parking is a pre-existing nonconforming use. Neither the City nor any other agency defendant had the authority to make a legal determination regarding the status of the lawn as a pre-existing non-conforming use. Thus, the Court rejects plaintiffs' argument that defendants should have considered the legality of 202 parking spaces on the premises as part of the NHPA review process.

Plaintiffs have expressed great concern over the potential negative effects of the undertaking on the availability of parking, not only parking in the NHLD, but also parking on the Hotel lawn. Plaintiffs have tenaciously argued that the project will result in even greater competition for an already scarce supply of parking spaces in the NHLD, and that the Hotel lawn, a vital feature of the Hotel, will be destroyed. Plaintiffs insist that since the nineteenth century the so-called "Great Lawn" has served as the signature feature of the Hotel, and lawn parking undermines its integrity and the ambiance of the prop-

---

20. The Court takes no position on the legal issue of whether 202 parking spaces are permitted as a pre-existing non-conforming use.

21. After the NHPA review process had been completed, counsel for Mayor Gaffney and the City drafted a memorandum which concluded that "it appears as though the Congress Hall

parking lot is a pre-existing nonconforming structure" since the Hotel's use of the lawn for parking predated the 1974 Cape May parking ordinance. (Montano Certif. ¶ 74 and Ex. 49). The Court finds this conclusion irrelevant for purposes of deciding the pending motions.

erty. The Court is not unsympathetic to plaintiffs' concerns, but plaintiffs' romantic vision of the Hotel must be reconciled with the realities of the twenty-first century. Locales such as Cape May are regularly inundated with traffic caused by tourism, and residents of such areas, who choose to live in proximity to the shoreline, will necessarily suffer some inconvenience.

Despite plaintiffs' claims, a review of the administrative record reveals that the City did not ignore these concerns. Plaintiffs' contention that NHLD parking will be adversely affected is incorporated into the PA by Stipulation V.E which requires the City, the NJSHPO, the NPS, and local businesses to complete a Parking Management Study to consider "the feasibility of developing parking structures or remote parking areas to ease parking problems within the Cape May NHL District." (Montano Certif. Ex. 48, p. 7).

Stipulations V.A—V.D set forth the following specific measures designed to protect the integrity of the Hotel lawn: (1) that the number of lawn parking spaces lost as a result of the conference center construction, if completed, cannot be replaced; (2) that the grass on the lawn must be carefully maintained, and that the use of asphalt in the parking area is prohibited; (3) that appropriate landscaping techniques must be used to buffer the parking area from adjacent properties; and (4) that measures be taken to control and reduce excessive "lighting, noise, and atmospheric emissions." (Montano Certif. Ex. 48, p. 7). The inclusion of these stipulations belies plaintiffs' claim that the City failed to consider the parking concerns, and made no attempt to mitigate potential harms.

The Court finds that the City did not make an arbitrary and capricious determination that 202 parking spaces are permitted on the Hotel lawn, properly refused to consider whether lawn parking is a preexisting non-conforming use of the premises, adequately took into account the potential adverse effects of parking, and included provisions in the PA which seek to mitigate potential harm. Therefore, defendants are entitled to summary judgment on Count One.

## II. *Count Two—The Decision to Use a PA Rather Than an MOA Was Neither Arbitrary Nor Capricious*

In Count Two of the amended complaint, plaintiffs allege that "[t]he determination by the City of Cape May, the SHPO, the ACHP [Advisory Council] and their respective officials to execute a PA instead of the more comprehensive MOA was arbitrary and capricious in that it was based on the erroneous determination that the Project is a complex undertaking." (Amended Complaint ¶ 79). Plaintiffs contend that the project is not complex, and that the City was not delegated major decision-making authority which would justify the use of a PA under the regulations. Defendants argue that they are entitled to summary judgment on Count Two because the decision to use a PA was neither arbitrary nor capricious based on the regulations. According to defendants, the use of a PA is justified given the complex nature of the project, the need to proceed with the Phase I rehabilitation to avoid jeopardizing the use of HUD funds, and the inability to fully assess the potential adverse effects of Phase II construction on the Cape May NHLD since the design remains conceptual and subject to revision. Because the Court finds sufficient support in the regulations for the use of a PA, the decision was neither arbitrary nor capricious. Therefore, the defendants are entitled to summary judgment on Count Two of the amended complaint.

The Advisory Council has promulgated regulations governing the use of PAs and MOAs. 36 C.F.R. § 800.14(b) (1999) provides in relevant part:

*Programmatic Agreements.* The Council and the Agency Official may negotiate a Programmatic Agreement to govern the implementation of a particular program or the resolution of adverse

effects from certain complex project situations or multiple undertakings.

(1) *Use of Programmatic Agreements.* A Programmatic Agreement may be used:

(i) When effects on historic properties are similar and repetitive or are multi-State or regional in scope;

(ii) When effects on historic properties cannot be fully determined prior to approval of an undertaking;

(iii) When nonfederal parties are delegated major decisionmaking responsibilities;

(iv) Where routine management activities are undertaken at Federal installations, facilities, or other land-management units; or

(v) Where other circumstances warrant a departure from the normal section 106 process.

On October 18, 1999, the Advisory Council stated that it had considered the consulting parties' objections to the use of a PA and had decided that such objections were unfounded. According to the Advisory Council, 36 C.F.R. § 800.14(b)(1)(ii) and (iii) justified the use of a PA in this case.[22] The Advisory Council explained:

In accordance with 36 CFR Section 800.14 of our regulations, "Protection of Historic Properties" (36 CFR Part 800), a PA can be used for complex projects *when the effects on historic properties cannot be fully determined prior to approval of an undertaking.* Congress Hall, we believe, is a complex project given the significance of the property within the Cape May National Historic Landmark (NHL) District, the proposal to combine rehabilitation and new construction on the site, the conceptual nature of the design for the addition, and the need for the City to address the parking shortage within the District before the developer can commit to restoration of the lawn. Thus, the effect of the new construction proposed as part of Phase II on the NHL District cannot be fully assessed until the developer completes the design analysis for the proposed addition and the City prepares a parking study which identifies off-site parking options for patrons of the hotel. [Montano Certif. Ex. 47 (emphasis in original) ].

The NJSHPO concurred with the Advisory Council's determination that the project is a complex one. (Affidavit of Daniel Saunders ¶ 20). However, according to plaintiffs, "there is nothing complex or unusual about a straightforward restoration and addition to an existing historic structure on a single city block." (Plaintiffs' Opposition Brief p. 28).

The term "complex project" is not defined by the regulations. However, in light of the fact that the Advisory Council drafted these regulations, and interpreted them to include the present undertaking as a complex project, the Court must afford that interpretation substantial deference. *See Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (citations omitted) (affording "substantial deference to an agency's interpretation of its own regulations"); *Beazer East, Inc. v. United States Environmental Protection Agency, Region III,* 963 F.2d 603, 606 (3rd Cir.1992) (same). Undoubtedly, other undertakings have been more expensive, lengthy, and complicated than the present one, but the Court cannot say that the Advisory Council reached an arbitrary and capricious determination that this undertaking is a complex project.

When the effects of a complex project on a historic property cannot be ascertained prior to approval, a PA may be used. 36 C.F.R. § 800.14(b)(1)(ii) (1999). The Court also cannot say that the agency reached an arbitrary and capricious deter-

---

**22.** The Court does not consider defendants' argument that 36 C.F.R. § 800.14(b)(1)(iii) (1999) justified the use of a PA because that regulation was not relied on during the review process.

mination that certain adverse effects could not be ascertained prior to project approval. After all, Phase II remains conceptual, and, at this time, the potential adverse effects resulting from Phase II construction cannot be gauged.

In addition to the above regulations, the Advisory Council has published a comprehensive guidebook on the proper use and drafting of agreement documents. The section entitled "Rehabilitating historic buildings or structures" provides in relevant part:

The agreement document in such a case is normally an MOU, or a PA covering, for example, a local government's Community Development Block Grant (CDBG) program. In either case, the document should provide for the detailed project design to be developed in consultation with the SHPO and submitted to the SHPO for approval. Where the SHPO does not approve, the matter should be submitted by the agency to the Council for consultation and resolution of the disagreement.

[Advisory Council, *Preparing Agreement Documents: How to Write Determinations of No Adverse Effect, Memoranda of Agreement, and Programmatic Agreements Under 36 CFR Part 800*, at 38 (Sept.1989).]

The next section of the publication is entitled "Additions to/new construction within or adjacent to historic buildings or structures." It states, in pertinent part: "Because it is seldom possible to avoid all adverse effects from new construction, new construction is usually best viewed as a subject for an MOU or PA." *Id.* at 40.

Like the regulations, these guidelines indicate that the Advisory Council contemplated that PAs would be used for rehabilitation projects and for new construction projects. Thus, the Court finds that 36 C.F.R. § 800.14(b)(1)(ii) (1999) and these two non-binding sections of the guidebook adequately support the agency defendants' decision to use a PA under the circumstances. Consequently, the Court refuses

to disturb the decision to proceed with the use of a PA because it was neither arbitrary nor capricious.

Plaintiffs argue that the use of a PA is a method to bypass agency review of Phase II when it comes to fruition. However, if Phase II is privately financed, it is not subject to NHPA and NEPA review. *See Edwards v. First Bank of Dundee*, 534 F.2d 1242 (7th Cir.1976) (finding demolition project not subject to NHPA and NEPA review because it was to be privately financed). However, plaintiffs' concern is unfounded since even if Phase II is privately financed, the construction of the conference center would remain subject to further review, which Stipulations IV.B and IV.C expressly state. (Montano Certif. Ex. 48, pp. 6–7).

Stipulation IV sets forth detailed requirements governing the design and review of Phase II by the NJSHPO and the City. In addition, Stipulation IV.B provides that the plans will be made available for review by the consulting parties, and that the final plans shall be revised "to reflect the recommended changes needed to address pertinent comments from the SHPO, Cape May Planning Board, Cape May HPC [Historic Preservation Committee], and the public." (Montano Certif. Ex. 48, p. 6). In light of the input that the consulting parties will be able to exercise, the Court finds that there is no basis for plaintiffs' claim that a PA was selected as a means of evading agency review for Phase II.

Plaintiffs also object to other PA stipulations, apparently because they fear that the PA will prematurely expire and they will lose the opportunity to comment on Phase II pursuant to Stipulation IV.B. Plaintiffs argue that Stipulations X and XV impermissibly grant CHP the right to amend the PA without being subject to the required agency review process. The Court views these concerns as speculative and meritless.

Stipulation X, which is entitled "Modification of Approved Plans and Specifications," states:

A. The Property Owner shall consult with the New Jersey SHPO regarding proposals to modify previously approved plans and specifications. A written request summarizing the nature of the proposed modification shall be submitted to the New Jersey SHPO prior to scheduling a consultation meeting.

1. As part of its review, the New Jersey SHPO shall assess the effect of the proposed modification on Congress Hall and the Cape May NHL District.

2. If it is determined that the modifications will have an effect on Congress Hall or the Cape May NHL District, the New Jersey SHPO may recommend treatment or mitigation measures, or request that the City be notified and consultation on an amendment be initiated in accordance with Stipulation XV.

3. The New Jersey SHPO's written approval for the modification must be obtained by the Property Owner prior to proceeding with the proposed activity.

B. The New Jersey SHPO may waive the forgoing consultation and approval requirements if it determines that proposed modifications are minor.

C. The Property Owner shall notify the City and the Council of all SHPO approved modifications.

[Montano Certif. Ex. 48, pp. 9–10.]

Stipulation XV provides:

A. Any signatory to this PA, or its successors and assignees, may request that the Agreement be amended, whereupon the parties will consult in accordance with 36 CFR section 800.14(b) to consider such amendment.

B. Should the Property Owner decide not to proceed with Phase II of the Project, the City shall request an amendment to the PA to reflect this change in the scope of the undertaking.

C. The City shall notify consulting parties when consultation has been initiated to consider an amendment to the PA, and inform them of the circumstances which have led to the request for an amendment. The signatories to the PA shall consider requests from consulting parties to participate in the consultation to develop an Amendment to the PA.

[Montano Certif. Ex. 48, p. 12.]

According to plaintiffs, these two stipulations impermissibly permit CHP to alter or to amend the PA without any agency review, and without regard for the rights of the consulting parties. The Court disagrees. Stipulation X requires CHP to request permission from the NJSHPO to amend the PA. Further, subsection C of Stipulation XV provides that the agencies must consider requests from consulting parties to comment on any proposed amendment to the PA. These provisions protect the consulting parties by preventing CHP from unilaterally altering the PA.

Plaintiffs also argue that Stipulation XVII, the Sunset Clause, states that the PA will expire on August 31, 2002, and after its expiration, CHP can proceed with Phase II construction without proper agency review. Again, the Court disagrees. Stipulation XVII states:

A. The terms of this PA shall be valid and binding upon the City until August 31, 2002, unless, at the request of the City, the New Jersey SHPO and Council agree to an extension.

1. The City shall consult with the Property Owner, the New Jersey SHPO, and the Council to determine what additional time is needed to complete the Project.

2. The City shall notify the consulting parties of the date of the extension approved by the New Jersey SHPO and the Council.

B. Stipulation III.G. will survive the expiration of this PA.

[Montano Certif. Ex. 48, p. 12–13.]

Defendants claim that, under the Sunset Clause, the PA will expire on August 31, 2002 only if the project has been completed. Pursuant to subsection A.1, if the project remains incomplete, the PA will be extended for an appropriate amount of time. Plaintiffs' contention that the consulting parties will lose the opportunity to comment on Phase II after August 31, 2002, is unfounded.

Because the Court finds that the decision to use a PA was neither arbitrary nor capricious, and that the provisions of the PA itself are neither arbitrary nor capricious, defendants are entitled to summary judgment on Count Two.

### III. Count Three—The City Did Not Violate the NEPA by Bifurcating the Project During the Environmental Review Process

In Count Three of the amended complaint, plaintiffs allege that the City violated 24 C.F.R. § 58.32, which requires project aggregation during the environmental review process. (Amended Complaint ¶¶ 88–90). Plaintiffs argue that the regulations expressly forbid the City from segmenting portions of a project that are geographically or functionally related, and, thus, the City should have assessed the potential environmental effects of the project as a whole. Defendants claim that they are entitled to summary judgment on Count Three because Phase II remains conceptual and speculative, and, consequently, was properly excluded from consideration during the environmental review process. The Court agrees with defendants, and grants summary judgment in their favor on Count Three.

24 C.F.R. § 58.32(a), the project aggregation regulation, provides: "A responsible entity must group together and evaluate as a single project all individual activities which are related either on a geographical or functional basis, or are logical parts of a composite of contemplated actions." 24 C.F.R. § 58.32(c), which explicates the aggregation requirement, provides:

The purpose of project aggregation is to group together related activities so that the responsible entity can:

(1) Address adequately and analyze, in a single environmental review, the separate and combined impacts of activities that are similar, connected and closely related, or that are dependent upon other activities and actions. (See 40 CFR 1508.25(a)).

(2) Consider reasonable alternative courses of action.

(3) Schedule the activities to resolve conflicts or mitigate the individual, combined and/or cumulative effects.

(4) Prescribe mitigation measures and safeguards including project alternatives and modifications to individual activities.

In Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the Supreme Court interpreted the NEPA to determine when a comprehensive impact statement is required. The Kleppe Court stated that

respondents appear to seek a comprehensive impact statement covering contemplated projects in the region as well as those that already have been proposed. The statute, however, speaks solely in terms of proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.

[Id. at 410 n. 20, 96 S.Ct. 2718 (citation omitted).]

In Society Hill Towers Owners' Ass'n v. Rendell, 210 F.3d 168, 181–82 (3rd Cir. 2000), the Third Circuit adopted the hold-

ing of *Webb v. Gorsuch,* 699 F.2d 157, 161 (4th Cir.1983), where the Fourth Circuit explained: "Generally, an administrative agency need consider the impact of other proposed projects when developing an EIS for a pending project only if the projects are so interdependent that it would be unwise or irrational to complete one without the others." The *Society Hill* Court added the following comments:

However, we believe that a court must also consider the likelihood that a given project will be constructed along with the interdependence of other projects. The more certain it is that a given project will be completed, the more reasonable it is to require a UDAG [Urban Development Action Grant] applicant to consider the cumulative impact of that project and the applicant's project in determining the applicant's obligations under the applicable regulations.

[*Society Hill Towers Owners' Ass'n, supra,* 210 F.3d at 181–82.]

It is improper to segment a large or cumulative project if the purpose is to avoid having to designate the project a "major Federal action" which requires the preparation of an EIS, because doing so creates a loophole to the NEPA. *See Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231, 240 (3rd Cir. 1980), *cert. denied,* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981).

Frequently, the issue of improper segmentation arises in the context of highway construction projects because roads are generally constructed in sections. *See, e.g., Named Individual Members of San Antonio Conservation Soc. v. Texas Highway Dept.,* 446 F.2d 1013 (5th Cir.1971), *cert. denied,* 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972) (finding segmentation of a highway construction project improper where the middle section of highway was merely a portion of the project without independent utility); *Bennett v. Taylor,* 505 F.Supp. 800 (M.D.La.1980) (concluding that there was no improper segmentation because the last remaining stretch of un-

improved highway had "wholly separate utility" from the previously constructed portions of the road); *Hawthorn Environmental Preservation Ass'n v. Coleman,* 417 F.Supp. 1091 (N.D.Ga.1976), *aff'd,* 551 F.2d 1055 (5th Cir.1977) (determining that segmentation of highway project into two phases was improper because the two phases were interrelated and did not have independent utility).

In *Vieux Carre Property Owners, Residents and Assocs., Inc. v. Pierce,* 719 F.2d 1272 (5th Cir.1983), the Fifth Circuit determined that there had not been improper segmentation of a multi-phased construction project. In rejecting the argument that segmentation had been improper, the Court concluded:

Confronted with a project that had independent utility, the City properly determined that it should be assessed independently of future speculative phases. Not only was the decision imminently reasonable under the facts before the City, it was entirely consistent with this Court's holdings that "NEPA does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions." *South Louisiana Environmental Council, Inc. v. Sand,* 629 F.2d 1005, 1015 (5th Cir. 1980) (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 2730 n. 20, 49 L.Ed.2d 576 (1976)). As was the situation in *Environmental Defense Fund v. Marsh,* 651 F.2d 983 (5th Cir. 1981), "we are here dealing with the projects that are historically distinct, one of which is proposed and the other still in the process of study and design. In that situation, NEPA does not yet require the [agency] to evaluate the environmental impact of the [second project]." *Id.* at 999.

[*Id.* at 1278.]

In the present case, Phase I is the only proposed action presently subject to review because the Phase II design and construction plans remain uncertain, making

the determination of environmental effects unascertainable. The following provision of the PA supports this conclusion: "**WHEREAS**, the City, New Jersey SHPO, and [Advisory] Council have agreed that pursuant to 36 CFR Section 800.14, a Programmatic Agreement (PA) should be developed due to ... the inability to fully assess the potential adverse effects of the design of Phase II on the Cape May NHL District since the conceptual design is still being revised...." (Montano Certif. Ex. 48, p. 2) (emphasis in original). In addition, on August 13, 1999, the Advisory Council stated in its comments on the draft PA: "Since the design on the new construction is not yet available for review, the PA needs to clarify how the design criteria negotiated as part of Section 106 will be applied, and how this will be coordinated with the Historic Tax Act and local planning review processes." (Affidavit of Anthony Monzo, Ex. B, p. 1).

Plaintiffs argue that the Phase II plans are more definite than defendants represent since CHP has already received a private funding commitment for Phase II. (George Lesser Certif. Ex. 10). Defendants dispute that assertion and claim that the construction loan which has been secured is to be devoted solely for Phase I. (Montano Supplemental Certif. ¶ 6). However, a June 4, 1999 letter from the lender outlining the construction loan provisions states that the loan "shall be used for the Borrower's renovation and/or construction of a four (4) story hotel complex containing approximately 88,164 square feet (inclusive of the three (3) story annex to the existing building), to be comprised of 100 hotel rooms, 5 suites, 7,734 square feet of retail space, an 80–seat main level restaurant and bar, a 60–seat brew pub and lounge in the retail atrium and basement, a 2,000 square foot meeting space...." (George Lesser Certif. Ex. 10). Because this letter suggests that the existing financing commitment includes Phase II, this consideration militates against bifurcation.

However, a third factor, namely, the independent utility of both phases of the project favors the decision to bifurcate. There will be resulting utility from the rehabilitated Hotel even if the conference center is not built. While the completion of the conference center will confer additional benefits on the developer, a rehabilitated Hotel by itself will have significant utility. Finally, there is no evidence before the Court that the potential environmental effects of both phases, when considered together, will have a "cumulative or synergistic environmental impact." *Kleppe, supra,* 427 U.S. at 410, 96 S.Ct. 2718. In other words, the record lacks evidence that any Phase I environmental effects would be exacerbated by Phase II. Consequently, the potential environmental effects of both phases together is not greater, both qualitatively and quantitatively, than the sum of the environmental effects of Phases I and II. This is another factor supporting bifurcation.

Having weighed all of these factors which relate to the propriety of bifurcation, the Court finds that bifurcation was neither arbitrary not capricious because the Phase II plans remain indefinite, and both phases have independent utility and lack cumulative and synergistic environmental effects. Thus, defendants are entitled to summary judgment with respect to Count Three of the amended complaint.

**IV. Count Four—The City Did Not Act in an Arbitrary or Capricious Manner by Failing to Conduct an Independent Evaluation of the Proposed Project**

In Count Four of the amended complaint, plaintiffs allege that the City failed to conduct an adequate NHPA review pursuant to Sections 106 and 110(f) of the NHPA because it did not engage in an independent analysis of the project's potential adverse effects, but rather relied on documents that had been submitted by CHP without performing an independent analysis. (Amended Complaint ¶¶ 93–97).

According to plaintiffs, "the City simply rubber stamped the Programmatic Agreement without conducting any of the analysis required by Section 106 and 110(f) of the NHPA, and, thus, its actions were arbitrary and capricious." (Plaintiffs' Opposition Brief p. 39). Defendants contend that they are entitled to summary judgment on Count Four because the City, as the Agency Official, complied with the NHPA procedural requirements, and nothing more is mandated. The Court agrees with defendants and concludes that the City did conduct an independent review of the undertaking. Consequently, defendants are entitled to summary judgment on Count Four.

The Third Circuit, which has adopted a narrow view of the Section 106 requirements, unlike some other federal circuits, has determined that the NHPA only imposes relatively limited procedural obligations. *See Concerned Citizens Alliance, Inc., supra,* 176 F.3d at 695–96. Given the Third Circuit's narrow interpretation of Section 106, Section 110(f) is subject to a similar interpretation. *See National Trust for Historic Preservation v. Blanck,* 938 F.Supp. 908, 920–22 (D.D.C.1996) (finding that Section 110 did not impose substantive obligations because Congress intended Section 110 to be construed similarly to Section 106), *aff'd,* 203 F.3d 53 (D.C.Cir. 1999).

### A. Plaintiffs Had Ample Opportunity to Comment and Their Comments Were Taken into Consideration

The record contains ample evidence to support defendants' position that the NHPA review process was properly carried out and that plaintiffs were afforded a sufficient opportunity to comment. From the very beginning of the review process, plaintiffs have had numerous opportunities to comment. In July 1998, when the City held the first public hearing on the proposed undertaking, George Lesser and Barbara Skinner were present to object to it. In September 1998, the Friends of

Congress Hall submitted written opposition to the project. The City received additional comments from some plaintiffs and many other members of the public after the City solicited public comments in October 1998. In June 1999, the Friends of Congress Hall and George Lesser submitted comments in opposition to the City's no-adverse-effect determination.

In June 1999, the City granted consulting party status to George Lesser and the Skinners, thereby affording them additional rights to participate directly in the NHPA review process. The consulting parties attended public hearings on June 18, 1999 and August 13, 1999 to discuss the draft PA and to provide input. The consulting parties also submitted written comments several times on the draft PA, and many of the issues raised were incorporated into the PA. The Court finds no merit to plaintiffs' claim that they, any consulting party, or any member of the public was not afforded the opportunity to comment during the review process.

### B. The Section 110(f) Review

With respect to the mitigation requirement of Section 110(f), the PA contains ample evidence that the agency defendants have attempted to minimize the harm of Phase I and have inserted provisions which establish defendants' intention to continue to mitigate harm if Phase II plans are developed. The PA provides in relevant part:

> **WHEREAS,** consistent with the requirements of Section 110(f) of the NHPA, the City and Property Owner have evaluated a range of treatment options, in consultation with the New Jersey SHPO, to ensure that the treatment of Congress Hall adheres to the recommended approaches in the Secretary of Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings (Standards); and,

> "**WHEREAS,** the City, in order to ensure that the requirements of Section 110(f) continue to be met, will require

the Property Owner to evaluate alternative designs for Phase II, the proposed convention/conference center addition, in response to preliminary comments received from the New Jersey SHPO...." [Montano Certif. Ex. 48, p. 2 (emphasis in original).]

Specifically, Stipulation III.A states: "In order to avoid adverse effects to the Cape May NHL District, the Property Owner shall rehabilitate the exterior and interior of Congress Hall in accordance with the plans prepared by Finegold Alexander & Associates and Jeremiah Eck Architects, Inc., and dated March 29, 1999, which were conditionally approved as 'No Adverse Effect' by the New Jersey SHPO in its June 16, 1999, letter to the Property Owner." According to Stipulations III.B and III.C, during the Phase I rehabilitation, the hallway ceilings cannot be lowered, the lobby and exterior can only be altered in a limited manner, and the topography of the lawn must be preserved. (Montano Certif. Ex. 48, pp. 4–5). As discussed *supra*, Stipulation V sets forth a number of measures intended to mitigate potential adverse parking effects. (Montano Certif. Ex. 48, p. 7). The Court regards these PA provisions as evidence that measures to mitigate resulting harm to the Hotel from Phase I have been considered and taken, and that such measures will be considered and taken, if and when, Phase II goes forward.

Because the Court finds ample evidence in the record to conclude that defendants complied with Sections 106 and 110(f), the Court grants summary judgment on Count Four in favor of defendants.

## V. *Count Five—The City's No–Adverse–Effect Finding Was Not Procedurally Flawed*

In Count Five of the amended complaint, plaintiffs allege that the City failed: (1) to find that the undertaking would have adverse effects in violation of 36 C.F.R. § 800.5(a)(1) (1999); (2) to document properly the no-adverse-effect finding in violation of 36 C.F.R. § 800.11(e) (1999); and (3) to consider "prudent and feasible project alternatives." (Amended Complaint ¶¶ 34, 100–103). First, defendants argue that plaintiffs' claim that the City erroneously failed to consider the adverse effects of the project must be dismissed because it is moot. Second, defendants claim that the Advisory Council properly determined that the City had adequately documented its no-adverse-effect finding, and that the Court should defer to that conclusion. Third, defendants contend that there is no binding authority which required the City to consider prudent and feasible project alternatives. The Court agrees with defendants on these three points, and, thus, grants summary judgment to defendants on Count Five.

### A. *The City Considered Adverse Effects*

Plaintiffs argue that the City failed to consider whether the project would have adverse effects, in violation of 36 C.F.R. § 800.5(a)(1) (1999), which provides:

An adverse effect is found when an undertaking may alter, directly or indirectly, and [sic] of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.

After the City issued its no-adverse-effect determination, the NJSHPO and the Advisory Council reviewed the finding and disagreed with the City's conclusion. The NJSHPO explained:

These comments on the proposed rehabilitation of Congress Hall are in response to your finding of no adverse effect. I agree that the first phase of the project will have **no adverse effect** provided that the conditions which I have provided below are met. However, the project, taken as a whole (including Phase II), is not yet fully in conformance with the Secretary of the Interior's Standards for Rehabilitation and therefore will have **adverse effects** on Congress Hall. Accordingly, I agree that we need to develop a Programmatic Memorandum of Agreement for the project. [Montano Certif. Ex. 29 (emphasis in original).]

The Advisory Council determined

that the proposed undertaking, when considered in its entirety, will have an adverse effect on the Cape May Historic District National Historic Landmark (NHL). In addition, to the adverse effects which may result from the construction of the new convention center adjacent to the Congress Hall annex, we believe there is also the potential for select treatments proposed during rehabilitation to alter the property in a manner which does not fully adhere to the *Secretary's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings (Standards).* Notwithstanding the developer's assurance that the rehabilitation will meet the *Standards,* and his acceptance of the conditions set forth in the New Jersey SHPO's comment letter of June 16, 1999, to the City, we believe additional mitigation measures are warranted for Phase I, and ongoing consultation to resolve adverse effects which may occur during phase I and subsequent phases is needed.

[Montano Certif. Ex. 30.]

After considering these comments, the City decided that a PA was necessary to ensure that the potential adverse effects noted by the NJSHPO and the Advisory Council would be addressed. By accepting these recommendations, the City implicitly altered its initial no-adverse-effect determination.

Ironically, the Friends of Congress Hall raised the same argument in their August 27, 1999 comments on the draft PA. The third comment stated: "Then–Mayor Elwell's May 27 'finding' of 'no adverse effect' has now been superseded by the events and 'overturned' by the Advisory Council's finding." (Affidavit of Anthony Monzo, Ex. C). The Advisory Council's comments and recommendations, which were subsequently adopted, rendered the City's initial no-adverse-effect finding moot. Thus, there is no reason for the Court to disturb the review process since the adverse effects that the Mayor did not recognize were noted by the NJSHPO and the Advisory Council, and were incorporated into the PA. Consequently, the Court rejects plaintiffs' first claim that the City failed to consider the adverse effects of the project.

**B.** *The City Properly Documented Its No–Adverse–Effect Finding*

■ Plaintiffs' second contention in Count Five is that the City failed to document adequately its no-adverse-effect finding, in violation of 36 C.F.R. § 800.11(e) (1999), and failed to provide that documentation to the consulting parties, in violation of 36 C.F.R. § 800.6(a)(3) (1999). However, the Advisory Council considered this claim and rejected it after determining that the City had complied with the regulations requiring the provision of sufficient documentation in support of his finding. 36 C.F.R. § 800.11(a) (1999) provides in pertinent part:

The Agency Official shall ensure that a determination, finding, or agreement under the procedures in this subpart is supported by sufficient documentation to enable any reviewing parties to understand its basis. . . . If the Council, or the SHPO/THPO when the Council is not involved, determines the applicable documentation standards are not met,

the Council or the SHPO/THPO, as appropriate shall notify the Agency Official and specify the information needed to meet the standard. At the request of the Agency Official or any of the consulting parties, the Council shall review any disputes over whether documentation standards are met and provide its views to the Agency Official and the consulting parties.

When the Agency Official makes a no-adverse-effect determination, the following documentation is required:

(1) A description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, and drawings, as necessary;

(2) A description of the steps taken to identify historic properties;

(3) A description of the affected historic properties, including information on the characteristics that qualify them for the National Register;

(4) A description of the undertaking's effects on historic properties;

(5) An explanation of why the criteria of adverse effect were found applicable or inapplicable, including any conditions or future actions to avoid, minimize or mitigate adverse effects; and

(6) Copies or summaries of any views provided by consulting parties and the public.

[36 C.F.R. § 800.11(e) (1999).]

In his May 24, 1999 letter in which he confirmed the no-adverse-effect determination, the Mayor stated in relevant part:

In accordance with 36 C.F.R. sections 800.8 and 800.9(c)(2), and after reviewing the comments submitted as well as other documentation, I have determined that the proposed rehabilitation project will have "no adverse effect" on the historic Congress Hall Hotel or the Cape May National Historic Landmark District since the rehabilitation project will be "conducted in a manner that preserves the historic and architectural value of affected historic property through conformance with the Secretary's 'Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings.'"

In support of this determination, I have enclosed the rehabilitation plans for the historic Congress Hall Hotel, a copy of the submission and application made by Congress Hall Partners, LLC for the rehabilitation tax credits, comments made on the submission and application for the tax credits by the New Jersey State Historic Preservation Officer, copies of photographs of the property, maps, a copy of the notice utilized to solicit public views, and copies of public comments.

\*　　\*　　\*　　\*　　\*　　\*

Copies of the documentation relied upon by me have been placed on record for review by said interested parties or any other member of the public. To that effect, a notice regarding the determination is being published contemporary herewith.

[Montano Certif. Ex. 24, p. 2.]

This letter was forwarded to the Advisory Council, the NJSHPO, CHP and the "interested parties." (Montano Certif. Ex. 24). On May 27, 1999, Sandy Montano, the Hotel's general manager, forwarded the documents on which the Mayor had relied in making the no-adverse effect determination to parties who had submitted comments. (Montano Certif. ¶ 49 and Ex. 27; Montano Supplemental Certif. ¶ 2). In addition, the City's May 27, 1999 public notice stated that the supporting documentation was "on file with the City of Cape May Planning Board and may be reviewed in the City's Planning Board office at the City of Cape May City Hall during regular weekday business hours." (Montano Certif. Ex. 25).

By letter dated October 18, 1999, the Advisory Council responded to the Mayor's request that it review the adequacy of his documentation:

As we have previously advised you and the City solicitor, the City, with the assistance of the developer, has submitted the required background documentation as set forth in 36 CFR Section 800.11(e) of our regulations, "Protection of Historic Properties" (36 CFR Part 800), to facilitate our review and enable us to prepare the PA. The May 24, 1999 submission from the City included 1) a detailed description of the undertaking with relevant plans; 2) a description of the area of potential effects; 3) a copy of the National Register nomination form for the Cape May National Historic Landmark District; 4) the City's effect determination; 5) a description of the proposed mitigation measures; and, 6) the views of the public.

[Affidavit of Mayor Gaffney, Ex. I].

The Advisory Council determined that the City had satisfied 36 C.F.R. § 800.11(e) (1999) by sufficiently documenting its no-adverse-effect determination, thereby enabling the Advisory Council to understand the basis for the City's finding. Thus, the Court rejects plaintiffs' contention that the documentation was not sufficient for the purpose of enabling the consulting parties to understand the City's finding. The Court refuses to disturb the Advisory Council's determination that the City complied with the documentation requirements.

Nor does the Court find any merit to plaintiffs' claim that the consulting parties were not furnished with the documentation to which they were entitled. Plaintiffs assert that the consulting parties sought and were denied access to "sufficient 'supporting' documentation" included in the City's files, but they do not identify the withheld documentation, or its relevance. (George Lesser Certif. ¶¶ 13, 15). The Court rejects the contention that the City should have also provided the consulting parties with additional unidentified documentation. Because the consulting parties received the documentation on which the City had relied, the documentation re-quirements of 36 C.F.R. § 800.6(a)(3) (1999) were satisfied.

### C. The City Was Not Required to Consider Prudent and Feasible Project Alternatives

■] Plaintiffs' final claim in Count Five is that defendants failed to consider prudent and feasible project alternatives. (Amended Complaint ¶¶ 34, 103). In support of their argument, plaintiffs cite Standard 4 of the Secretary of the Interior's Standards and Guidelines for Federal Agency Historic Preservation Programs which provides in pertinent part:

In those cases when an agency's undertaking directly and adversely affects an NHL, or when Federal permits, licenses, grants, and other programs and projects under its jurisdiction or carried out by a state or local government pursuant to a Federal delegation or approval so affect an NHL, the agency should consider all prudent and feasible alternatives to avoid an adverse effect on the NHL.

[63 Fed.Reg. 20,496, 20,503 (April 24, 1998).]

However, this provision is a non-binding guideline. "These guidelines have no regulatory effect. Instead, they are the Secretary's formal guidance to each federal agency on meeting the requirements of section 110 of the Act." 63 Fed.Reg. 20,496 (April 24, 1998). *See Wicker Park Historic District Preservation Fund v. Pierce*, 565 F.Supp. 1066, 1075 (N.D.Ill.1982) (finding "that neither NHPA nor the regulations impose upon HUD a duty to consider alternative sites for construction or completely different housing proposals such as rehabilitation"). Because the City was not required to consider prudent and feasible alternatives, the Court rejects the third claim asserted by plaintiffs in Count Five. Therefore, the Court grants defendants summary judgment on Count Five of the amended complaint.

## VI. Count Six—The City Did Not Abdicate Its Responsibility to Conduct an Independent Environmental Review of the Project

■ In Count Six of the amended complaint, plaintiffs allege that the City abdicated its responsibility to conduct an independent environmental review of the project because it relied on reports prepared by the environmental consultants that had been retained by the New Jersey Economic Development Authority. (Amended Complaint ¶¶ 110–116). Defendants argue that they are entitled to summary judgment on Count Six because the regulations do not prohibit the City from relying on the recommendations and findings of outside environmental consultants. The Court rejects plaintiffs' argument and grants defendants summary judgment on Count Six.

On September 23, 1999, the Community Initiatives Development Corporation, which had been hired by the New Jersey Economic Development Authority to perform an environmental review, informed CHP that it had retained Crawford & Associates to assist it. (Montano Certif. ¶ 68 and Ex. 43). On October 5, 1999, the City adopted a Resolution which stated that the City would rely on the environmental findings made by the outside consultants. (Amended Complaint ¶ 112).

Plaintiffs cite *Appalachian Mountain Club v. Brinegar,* 394 F.Supp. 105, 120 (D.N.H.1975), for the proposition that a federal agency cannot "rubber stamp" an environmental analysis under the NEPA; instead, the agency "must play an active role in the preparation" of the report. Defendants argue that the City's reliance on outside environmental consultants is a proper method for obtaining guidance on specialized environmental issues as long as the City makes the ultimate decision, as it did here. According to defendants, the City did not abdicate its authority by relying on outside consultants in light of the City's lack of expertise on environmental matters. The Court agrees with defendants and rejects plaintiffs' characterization of the City's review of the recommendations issued by the environmental consultants.

In *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897 (5th Cir.1983), the Fifth Circuit considered and rejected the same argument that plaintiffs raise here. The *Avoyelles* Court stated:

The landowners suggest that we need not defer to the agency's scientific expertise in this case because the agency relied on outside consultants. As long as the agency conducts its own independent and thorough review of the consultants' report, the agency's reliance on outside reports is within its discretion and does not change the standard of review. *See Save Our Wetlands v. Sands,* 711 F.2d 634 at 635–642 (5th Cir.1983) (Corps may rely on outside consultants in preparation of environmental impact statements); *Buttrey, supra,* 690 F.2d at 1185 (Corps' wetlands determination reviewed under arbitrary and capricious standard where Corps relied on information supplied by other individuals and agencies).

[*Id.* at 906 n. 17.]

The Court agrees with the Fifth Circuit's conclusion. The NEPA review process often involves the consideration of specialized scientific fields about which the reviewing agency itself lacks the knowledge to make an informed decision. To forbid consultation with outside experts would result in uninformed agency decisions. Recognizing that resort to outside sources with applicable expertise is reasonable, the Advisory Council, in its recently amended NHPA regulations, added the following provision:

*Use of contractors.* Consistent with applicable conflict of interest laws, the Agency Official may use the services of applicants, consultants, or designees to prepare information, analyses and recommendations under this part. The Agency Official remains legally responsi-

ble for all required findings and determinations. If a document or study is prepared by a nonFederal party, the Agency Official is responsible for ensuring that its content meets applicable standards and guidelines.

[36 C.F.R. § 800.2(a)(3) (1999).]

There is no persuasive reason to permit the Agency Official to rely on outside consultants to prepare reports for the NHPA review process, but to prohibit such reliance during the NEPA review. As long as the Agency Official retains the ultimate decision-making authority, the Court finds such action reasonable.

■ Plaintiffs also allege a violation of the NEPA because the City was obligated to coordinate its NEPA environmental assessment with the NHPA review process, and the failure to do so resulted in irreparable harm. (Amended Complaint ¶¶ 111, 116). However, this contention lacks merit. Both 36 C.F.R. § 800.8 (1999) and 36 C.F.R. § 800.14 (1998) encourage, but do not require, such coordination. Consequently, the Court finds that the decision not to coordinate the NHPA and NEPA reviews is entitled to deference since it was neither arbitrary nor capricious.

The Court finds no merit to plaintiffs' contentions that the City failed to conduct an independent environmental review by consulting with outside environmental experts, and by not coordinating the NHPA and the NEPA reviews. Therefore, defendants are entitled to summary judgment on Count Six.

## VII. Count Seven—The Fact that Defendant CHP is a Necessary Party Does Not State a Cause of Action

Count Seven of the amended complaint alleges that CHP is a necessary party to this action and must be joined pursuant to Fed.R.Civ.P. 19.[23] (Amended Complaint

---

**23.** Defendant CHP has not disputed plaintiffs' allegation that it is a necessary party.

**24.** "Categorical exclusion refers to a category of activities for which no environmental im-

¶¶ 21, 118–119). This count does not state a cause of action, and, thus, must be dismissed.

## VIII. Count Eight (The Proposed Amendment)—Leave to Amend is Denied as Futile

Plaintiffs request leave to file a second amended complaint to add Count Eight which alleges that the City arbitrarily and capriciously determined that an EIS need not be prepared because Phase I qualifies for a categorical exclusion.[24] (Proposed Second Amended Complaint ¶ 123). Further, Count Eight alleges that the refusal to draft an EIS "was premised on the City's exclusion of Phase II from the definition of the Project for NEPA review...." (Proposed Second Amended Complaint ¶ 124). In sum, Count Eight alleges that the City improperly bifurcated the project, in violation of 24 C.F.R. § 58.32(a), and based on the improper bifurcation, concluded that an EIS was not required. Defendants argue that plaintiffs' motive in filing this motion is to delay further the resolution of this matter, and that the proposed amendment is futile because it is premised on the meritless allegation that the decision to bifurcate the project was improper. In light of the Court's conclusion that the City did not improperly bifurcate the project, the Court finds that the proposed amendment becomes futile.

Fed.R.Civ.P. 15(a), which governs the amendment of pleadings, provides in pertinent part:

A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the

---

pact statement or environmental assessment and finding of no significant impact under NEPA is required...." 24 C.F.R. § 58.35.

trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

In *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court articulated the following policy for granting amendments pursuant to Fed.R.Civ.P. 15(a):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reasons—such as undue delay, bad faith or dilatory motive· on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

The Third Circuit has elaborated on the applicable analysis:

> The trial court's discretion under Rule 15, however, must be tempered by considerations of prejudice to the non-moving party, for undue prejudice is "the touchstone for the denial of leave to amend." In the absence of substantial or undue prejudice, denial must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment.
>
> [*Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands,* 663 F.2d 419, 425 (3rd Cir.1981) (citations omitted) (quoting *Cornell & Co., Inc. v. Occupational Safety and Health Review Comm'n,* 573 F.2d 820, 823 (3rd Cir. 1978)), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).]

■ A court may deny a motion to amend if it finds that such an amendment would be futile. *Foman, supra,* 371 U.S. at 182, 83 S.Ct. 227. *See also Federal Deposit Ins. Corp. v. Bathgate,* 27 F.3d 850, 874 (3rd Cir.1994); *Averbach v. Rival Mfg. Co.,* 879 F.2d 1196, 1203 (3rd Cir. 1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 726, 107 L.Ed.2d 745 (1990). "The trial court may properly deny leave to amend where the amendment would not withstand a motion to dismiss." *Massarsky v. General Motors Corp.,* 706 F.2d 111, 125 (3rd Cir.1983), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). Thus, if the proposed amendment "is frivolous or advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend." *Harrison Beverage Co. v. Dribeck Importers, Inc.,* 133 F.R.D. 463, 468 (D.N.J.1990) (quoting 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1487 at 637–642 (2nd ed.1990) (footnotes omitted)). To demonstrate that a claim is "legally insufficient on its face," and that it could not withstand a motion to dismiss, the opposing party must be able to demonstrate that "it appears beyond doubt that the [party] can prove no set of facts in support of [the] claim which would entitle [the party] to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Plaintiffs' allegation in Count Eight that the City made an improper categorical exclusion is premised on the assumption that 24 C.F.R. § 58.32(a) required the City to aggregate Phases I and II during the NEPA review process. In light of the Court's rejection of the improper bifurcation claim in Count Three, there is no basis for plaintiffs to sustain Count Eight which entirely rests on the premise that bifurcation was improper. Because the Court determined that the improper bifurcation claim in Count Three lacked merit, Count Eight becomes futile. Therefore, plaintiffs' motion for leave to filed a second amended complaint is denied.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motions for summary judgment, denies plaintiffs' cross-motion for summary judgment, and denies plaintiffs' motion for leave to file a second amended complaint. Accordingly, plaintiffs' amended complaint is dismissed with prejudice.